# CASES DETERMINED

## *January Term, 1880.*

49    39
108   323

SELLECK and another vs. GRISWOLD and another.

*March 10 — March 30, 1880.*

PLEADING: COUNTERCLAIM. *(1) Waiver, by reply, of technical objection to form of counterclaim.*
SPECIAL VERDICT: *(2) Answers held inconsistent.*
VENDOR AND PURCHASER of Timber Land. *(3) Purchaser's right of action for shortage in stipulated amount of timber.*
NEW TRIAL. *(4) Question left to court below, on equal division of this court.*

1. Where an answer sets out facts sufficient to constitute a counterclaim, and demands a positive judgment thereon against the plaintiff, and a reply is made thereto, and the issue tried without objection, it is too late to object here, on appeal, that such pleading of defendant was not therein *named* a counterclaim.

2. Defendants' right to recover on their counterclaim depended upon proof that, in estimating the amount of timber on certain lands, they had been misled by plaintiffs' agent. The jury found specially, that defendants, "by mistake," included in their estimate the timber upon other lands, "and that the agent of the plaintiffs was the cause of such false estimate;" but they also found that "the testimony does not show by what word or act, or in what manner, plaintiffs' agent caused defendants to view the wrong land." *Held*, that the findings are inconsistent, and will not sustain a judgment for the defendants.

3. Parties to a contract for an exchange of pine lands for city lots agreed that if, upon a view of the pine lands, within a certain time, the vendee thereof was not satisfied that they contained a specified amount of timber, persons appointed in a certain manner in behalf of both parties should estimate the amount; and any shortage appearing from such estimate should be compensated by a reconveyance of certain of the city lots at stipulated prices. Thereupon the vendee of the pine lands pro-

ceeded to view them within the time fixed, and expressed himself as satisfied with the amount of timber thereon, and mutual conveyances were made. *Held*, that such vendee could not afterwards recover for any shortage in the timber, without proof of a mistake on his part caused by the culpable act of the other party, or at least proof that upon discovery of a mistake prompt notice thereof was given to the other party, with a demand to have it corrected.

4. The justices of this court, sitting in the cause, being equally divided upon the question whether judgment should go for the appellants on the special findings, or there should be a new trial, the judgment is reversed, and the cause remanded for further proceedings according to law; leaving the court below to determine the question of a new trial. *Noonan v. Orton*, 31 Wis., 265.

APPEAL from the Circuit Court for *Door* County.

The case is thus stated by Mr. Justice TAYLOR:

" The plaintiffs brought their action to recover the sum of $2,701.37 and interest, which they allege they had been compelled to pay under the provisions of a contract made by the parties for the exchange of real estate situate in the city of Chicago, owned by the *Griswolds*, for property situated in Door county, owned by the *Sellecks*, and which, by the terms of such contract, the defendants were bound to repay to the plaintiffs. To this claim the defendants do not pretend to have made any successful defense, but, amongst other defenses, they alleged, by way of counterclaim, that the contract for the exchange of said real estate had been broken on the part of the plaintiffs, and that the defendants had suffered large damages by reason of such breach on their part.

" The claim on the part of the defendants is, that by the terms of such contract the plaintiffs had warranted that there were 10,000,000 feet of merchantable pine timber lying and standing on a certain tract of pine lands, containing about 1,055 acres, which, by said contract, the plaintiffs were to convey, and did convey, to the defendants; that such warranty was broken by reason of the fact that there were not 10,-000,000 feet of pine timber lying and standing on said tract

of land, and that the whole amount of said pine timber on such land, at the time of the conveyance, did not exceed 5,000,000 feet; and they claim as damages for the breach of such warranty at the rate of two dollars per thousand feet for 2,000,000 feet of such deficiency, and at the rate of four dollars per thousand feet for all the deficiency exceeding said 2,000,000 feet.

" Upon the trial, the jury were requested to find a special verdict; and they found, amongst other things, that the plaintiffs were entitled to recover the said sum of $2,701.37 and interest, claimed by them; and they also found in favor of the defendants, on their counterclaim, that the whole amount of pine timber on said lands, at the time the same were conveyed by the plaintiffs to the defendants, was 7,722,-507 feet, and no more.

"There was no dispute on the trial as to the price per thousand which the defendants were entitled to recover for the deficiency of the pine upon the lands conveyed (if there was any such deficiency), as the written contracts between the parties fixed the price at two dollars per thousand for 2,000,000 feet, and four dollars per thousand for the excess over the 2,000,000 feet.   There was, however, some question whether the 2,000,000 feet should be paid for in cash, or in certain Chicago lots conveyed by the defendants to the plaintiffs, at a valuation of $500 each.   The excess over the 2,000,000 was to be paid for at the rate of four dollars per thousand, in cash. By the terms of the written contracts, the 2,000,000 feet were to be paid for at the rate of two dollars per thousand in certain lots which the defendants, by the terms of the same contract, had conveyed to the plaintiffs, at a valuation of $500 per lot.

" It is admitted by the parties that the evidence on the trial showed that the plaintiffs had sold and conveyed away said lots before the trial of the action, and no evidence was given as to their real value.   Upon the special verdict both parties

moved for judgment, and the court ordered judgment in favor of the defendants for the sum of $3,215.14 damages, and $94.25 costs. This amount was arrived at in the following manner: The court allowed the plaintiffs' claim of $2,701.37 and interest thereon, $585.24, making a total in favor of plaintiffs of $3,286.61, and at the same time allowed the defendants —

| | | |
|---|---|---|
| For 2,000,000 feet of pine, at $2 per M. - | $4,000 | 00 |
| For 277,493 feet, at $4 per M. - - | 1,109 | 72 |
| Amount paid for an abstract, - - - | 30 | 00 |
| | $5,139 | 72 |
| And interest on this sum, at 6 per cent., from February 24, 1874, to the time of trial, - | 1,362 | 03 |
| Making in all, - - - - - - | $6,501 | 75 |
| Deducting amount allowed plaintiffs, - | 3,286 | 61 |
| Leaving balance in favor of defendants, | $3,215 | 14 |

—For which judgment was rendered in their favor.

"The plaintiffs appeal from the judgment, and allege as errors, *first*, that under the pleadings no judgment should have been rendered in favor of the defendants, because they had not set up any counterclaim in their answer; and *second*, that upon the findings of the special verdict the defendants were not entitled to recover anything, except, perhaps, the $30 for an abstract."

For the appellants there was a brief by *J. V. & C. Quarles*, and oral argument by *J. V. Quarles*.

*E. A. Sherburne*, for the respondents.

TAYLOR, J. We are clear that the matter set out in the defendants' answer was sufficient to constitute a counterclaim; and, although it was not named a counterclaim by the defendants, they demanded judgment thereon in their favor. The plaintiffs having treated it as such by replying thereto, and,

the case having been tried upon the theory that it was a counterclaim, it is too late to object here that it was error in the court below to enter judgment thereon in favor of the defendants, if, upon the evidence and finding, they are entitled to such judgment.

It is urged with great ability, on the part of the learned counsel for the plaintiffs, that the defendants had waived or forfeited all right under their contracts to recover anything for any deficiency of pine timber on the lands conveyed to them by the plaintiffs, and consequently had no right to recover on their alleged counterclaim. To understand the argument of counsel on this point, it will be necessary to state the exact terms of the two contracts made between the parties, bearing upon that subject.

The first contract was dated February 3, 1874, and upon this subject provided as follows: "It is estimated that the above described pine lands will cut 10,000,000 feet of good pine timber, and it is agreed by and between the parties contracting, that said first party [meaning defendants] is, within thirty days from this date, to view said pine lands, and in case he estimates the quantity of lumber thereon at less than herein estimated, then the said parties are, within forty days from this date, to select each one disinterested person, and said persons are together to view and estimate the quantity of said pine; and, in case they cannot agree on the amount, then they are to select a third party, who shall, with them, view the said pine and estimate the quantity thereof, and the decision of the three shall be final; and should said lumber fall short, as estimated by said viewers, of the amount herein estimated, to the amount of over 2,000,000 feet, then this contract shall be null and void; but if said estimated shortage is less than 2,000,000 feet of lumber, then said second party [meaning plaintiffs] shall make such shortage good by lots in Woodbury's subdivision, at prices taken by him, valuing the lumber at two dollars per thousand stumpage."

On the 21st of February, 1874, and before any estimate of the pine had been made, a second contract was made, which materially changed the first in regard to the pine timber. The first evidently contemplated the settlement of the question as to the quantity of pine on the lands contracted to be conveyed before the conveyances carrying out the contract for an exchange of the properties were delivered. Circumstances occurring which made it important that the plaintiffs should receive conveyances of the lands agreed to be conveyed by the defendants to them before that matter could be satisfactorily settled, another contract was made between the parties upon this as well as some other matters contained in the first contract. In regard to the pine timber, the contract of February 21, 1874, provided as follows: "I, *Benjamin Selleck*, in consideration of receiving the deeds to certain property formerly owned by *L. M. Griswold and Anne Griswold, his wife*, which said deeds are now in the possession of Ling & Holmes, do hereby agree with said *L. M. Griswold* that, should the amount of pine timber on certain lands purchased by said *Griswold* from me and located in Door county, Wisconsin, fall short of the specified amount of ten million feet, then I will make such shortage good to the amount of two million feet, at the rate of two dollars per thousand, to be paid in lots in Woodbury's subdivision, at Irving park, at $500 per lot, as purchased by me from said *Griswold*. But should said timber fall short of eight million feet, then I will pay for such shortage at the rate of four dollars per thousand feet in cash for all under eight million. In order to determine such shortage, it is agreed by and between said *Griswold* and myself, that said *Griswold* shall view said pine lands on or before thirty days from date, and in case he estimates the amount of timber thereon at less than ten million feet, then the said *Griswold* and myself shall, within forty days from this date, select each one disinterested person, and said persons shall together view and estimate the quantity of said pine; and in

case they, the persons so selected, cannot agree, then they shall select a third party and estimate the quantity thereof, and the decision of the three persons so selected shall be final." This contract, though signed by *Benjamin Selleck* and *L. M. Griswold* alone, was admitted by both parties to have been made on behalf of the parties to the original contract, and to be binding upon them.

It is claimed by the plaintiffs that under these several contracts the defendants could not recover for any shortage of pine timber on the lands conveyed, until the amount of such shortage was first ascertained in the manner provided in the contracts; and they also claimed that the defendants had viewed and estimated the pine in the manner provided, and, after making such estimate, had expressed themselves satisfied with the estimate in the contracts, and asked no further estimate to be made by other disinterested persons, to be selected by the parties, as therein provided. It will be seen that, by the pleadings in the case, the defendants adopted the same view of the contracts, but sought to evade the effect of the view and estimate made by them under the terms of the contracts, by alleging that there was a mistake made in such estimate, and that such mistake was occasioned by the deceit or fraud of the plaintiffs.

Upon the trial, the defendants amended their answer so as to raise but a single issue in the case as to their right to recover for the shortage of pine timber on the pine lands. The amended answer alleges that within the time prescribed for viewing said pine lands and making an estimate of the amount thereof by said defendants, as provided for in the second contract, they were induced by the plaintiffs to defer the time for viewing the same and making said estimate until some time in the month of June, 1874; and that, at the time to which said view and estimate were so deferred, defendant *L. M. Griswold* went with the agent of the plaintiff to make such view and estimate; that before that time said *Griswold* had never seen

said lands, and was unacquainted with their location; that the agent of the plaintiffs was well acquainted with said lands, and went with said *Griswold* as a guide, and conducted and showed him what he, said agent, then and there represented were the lands and pine timber mentioned in said contract; that said *Griswold* believed said representations to be true, and estimated the quantity of pine on the lands as shown to him at 10,000,000 feet.

Such answer then alleges, for the purpose of showing that the defendants ought not to be bound by such estimate made by and on behalf of the defendants, under the provisions of said contract, and that they are entitled to recover for any shortage which did in fact exist, notwithstanding they estimated the pine at 10,000,000 feet, and virtually accepted the same as containing 10,000,000 feet, without demanding any further or other estimate thereof, under the contract or otherwise; that in making said estimate said *Griswold* had been deceived by the agent of the plaintiffs; that said agent had shown said *Griswold* a large tract of land, which was no part of the tract conveyed to the defendants; and that said *Griswold*, in making his estimate of 10,000,000 feet, had estimated the pine on the lands so shown to him, and which were not a part of the tract purchased by the defendants; that in September following the defendants first learned of the deception which had been practiced upon them by the agent of the plaintiffs; that they then estimated the quantity of pine on the lands actually purchased, and estimated the quantity at less than 10,000,000 feet, and notified the plaintiffs' agent, in December, 1874, orally, that they were not satisfied with the amount of pine on the land, and on the 31st of August, 1875, notified the plaintiffs, in writing, to select a person to view and estimate the pine with a person to be selected by the defendants for that purpose, as provided in the agreements; and that the plaintiffs paid no attention to this request. The answer then avers that there were, in fact, less than 5,000,000

Selleck and another vs. Griswold and another.

feet of timber on the lands when said contracts were made, and claims to recover for the actual shortage under the counterclaim in said action.

By this amended answer or counterclaim the defendants themselves narrowed the issues as to their right to recover for any shortage of pine timber on the lands purchased by them, to two questions: *first*, whether the plaintiffs' agent had been guilty of any deceit or fraudulent practice at the time he showed the lands to the defendant *Griswold*, in June, 1874, which led him to make an overestimate of the pine on the lands purchased; and *second*, whether there was in fact any shortage. The jury have found that there was in fact a shortage of 2,277,493 feet, and this finding is so supported by the evidence that this court would not be justified in reversing the finding of the jury upon that point; and the only difficulty in the way of the defendants' right to recover arises from the findings of the jury upon the first question. If the agent of the plaintiffs was guilty of no deception, and did nothing to prevent the defendants from making a view and estimate of the lands actually purchased, and the defendants made a careless, imperfect or negligent view and estimate, and expressed themselves satisfied with the amount as fixed by the contract, there can be no doubt but that the defendants have accepted the estimate fixed in the contract, and cannot recover for any shortage which may have in fact existed.

The contract having provided that the defendants should view the lands and make an estimate within a fixed time, and that if, after making such view and estimate, they estimated the price at less than 10,000,000 feet (the amount estimated in the contract), each party should select a disinterested person, and, if they could not agree, they should select a third person, and the estimate of the three should be final as to the amount, and they having gone on under the contract as extended by mutual agreement, and made an estimate that there were 10,000,000 feet, that settles the question under the contract

that there was no shortage to be paid for by the plaintiffs, unless the defendants can show, as claimed in their answer, that this overestimate was induced or brought about by the fraudulent acts of the plaintiffs or their agents; or possibly defendants might show that they made a mistake in the estimate not attributable to their neglect, or the neglect of their agent, and that, upon the discovery of such mistake, they promptly communicated the fact to the other party, and asked to have the same corrected by a fair estimate under the terms of the contract.

The defendants do not claim any mistake, however, in their pleadings, except such as they allege was induced by the fraud or deception of the plaintiffs' agent. Upon this point the special verdict finds, in answer to the third question proposed by the defendants, "that *L. M. Griswold*, in estimating said pine timber in June, 1874, by mistake included in such estimate timber not on the lands conveyed by plaintiffs to the defendants, and that the agent of the plaintiffs was the cause of such false estimate." The jury were asked the following question by the plaintiffs: "If you answer the third question of the defendants in the affirmative, then state fully and particularly in what such mistake consisted, and in what way, and by what act or acts, the said agent of the plaintiffs became or was responsible for such mistake; and, if you say that the defendant *Griswold* viewed the wrong lands, then state in answer hereto, particularly, what lands were viewed and estimated by him which are not included in the contract." The jury answered this question as follows: "Plaintiffs' twentieth question [the one above stated] is answered by saying, the seven forties stated in evidence by *Mr. Griswold* in this action. Further answer to plaintiffs' twentieth question: The testimony does not show by what word or act, or in what manner, the plaintiffs' agent caused *Mr. Griswold* to view the wrong land."

To the third question propounded by the defendants the

jury answer generally, that the plaintiffs' agent was the cause of the false estimate; but when asked by the plaintiffs to state in what way or manner, or by what act or acts, such agent caused such false estimate to be made, the jury reply, in substance, "We don't know." "The testimony does not show by what word or act, or in what manner, the plaintiffs' agent caused *Mr. Griswold* to view the wrong land."

These answers cannot well stand together; they are not consistent with each other. If the evidence satisfied the jury that the plaintiffs' agent had caused the defendant *Griswold* to view the wrong land, and make a false estimate, it would seem that they ought to be able to point out some act or word, or some other thing in the conduct of such agent, which the evidence disclosed, and which induced them to find that he was in fault for the mistake.

The general verdict upon the subject of the conduct of the agent is, that he misled the defendant to his injury; but when asked to particularize and point out in what way the misleading was accomplished, they say the evidence does not show. It seems to us that if there is nothing in the evidence which shows by what means the deceit was practiced upon the defendant by the agent of the plaintiffs, there can be no evidence upon which to found a general finding that any deceit was in fact practiced. The main object of a special verdict is to obtain from the jury a statement of the facts proved, rather than conclusions deduced from such facts. It was important for the plaintiffs, at least, to know upon what facts found the jury based the conclusion that their agent was the cause of the false estimate made by the defendants. If they had given the facts which led them to the conclusion, it might have appeared that such facts did not sustain the conclusion. It is often of the utmost consequence to the rights of parties that the jury should give the facts from which they draw their conclusions.

The case of *Cottrill v. Railway Co.*, 47 Wis., 634, illustrates the propriety of requiring the jury to give the facts upon

which they base a general conclusion. In that case the jury found, as a general conclusion, that plaintiff's intestate was guilty of contributory negligence, and so his representative was not entitled to recover; but the special verdict also showed that it was highly probable that they based this general conclusion upon another fact which they found, viz., that the deceased, after seeing that a collision was imminent, might have jumped from his engine and thus prevented the injury. This court reversed a judgment for the defendant on the sole ground that this fact found by the jury did not justify the conclusion drawn by them. In the case of *Kearney v. Railway Co.*, 47 Wis., 144, this court reversed a judgment in favor of the plaintiff, notwithstanding the jury had found, generally, that the plaintiff was not guilty of contributory negligence, because, in the opinion of the court, the other special findings of fact were inconsistent with such conclusion. The same rule was laid down in *Haas v. Railway Co.*, 41 Wis., 44, 51. In *Lemke v. Railway Co.*, 39 Wis., 449, this court lays down the rule that when there is a general and special verdict, and the special verdict is inconsistent with the general, the special verdict must prevail. *Ryan v. Ins. Co.*, 46 Wis., 671; *Davis v. The Town of Farmington*, 42 Wis., 425.

The same rule must apply to the different parts of a special verdict. If one part of the verdict is a general conclusion, and the special facts are found upon which the conclusion is based, and such facts are inconsistent with the general conclusion, the special findings of fact must prevail over the general conclusion. In the case at bar it may be said that there are no special facts found upon which the conclusion of the jury is based, and that, therefore, there is no inconsistency between the conclusion and the facts found. We are of the opinion, however, that it is equally fatal to the conclusion when the jury find that the evidence does not disclose any fact upon which it is or can be based.

The special verdict fails to show with sufficient clearness

that the plaintiffs were the cause of the mistaken estimate made by the defendants; and, as it is found that the defendants did make a view and estimate under the terms of the contract, and expressed themselves satisfied as to the quantity of pine upon the lands, they are estopped now from alleging that they made a mistake in such estimate, unless, as alleged in their answer, they show that the act or acts of the plaintiffs, or their agents, caused such mistake.

If it were admitted that the defendants might recover for the shortage in the amount of pine without first resorting to the methods for estimating the same prescribed in the contracts, as was urged by the learned counsel for the respondents (but which we think is not at all clear), we are still of the opinion that the defendants would be estopped from claiming any such shortage, after going on, under the contracts, and making a view and estimate as therein provided, and expressing their satisfaction as to the amount. Having adopted the method of ascertaining the shortage prescribed by the contracts, they are concluded by the result of such method. If the provisions in the contracts provide for a settlement of the matter by arbitration, and the parties were at liberty to refuse to submit to that method of settling the difficulty, still, if they do submit to it, and an award or settlement is made in the manner therein prescribed, such settlement or award can not be avoided after it is made, except for fraud or mistake, any more than an award made by arbitrators upon any other voluntary submission to arbitration.

A party having made an agreement to submit his difference to the award of arbitrators' may withdraw from the agreement before the award is made; but if he submits to the arbitration, and an award is made before he gives notice of his withdrawal, it is too late, and the award is conclusive, unless avoided for the causes above stated. So in the case at bar, the defendants having made a view and estimate according to the terms of the contract, and having expressed themselves satisfied with

the estimate placed thereon by the opposite parties, that is an end to the controversy, unless they can avoid the effect of such settlement of the matter by showing a mistake in such estimate caused by the culpable acts of the plaintiffs, or, possibly, by showing that a mistake was made without culpable neglect on their part, and that upon the discovery thereof prompt notice was given to the opposite party, with a demand to have the same corrected.

We think the defendants are as much concluded in this case as they would have been if there had been simply a parol preliminary agreement for the sale of these lands by the plaintiffs to them, and the plaintiffs, in order to induce the purchase by the defendants, had said, "We estimate that there are 10,000,000 feet of pine timber on the lands, but to satisfy yourselves we will give you ten days to go and look the lands over and make your own estimate, and if, after making your own estimate, you are not satisfied with our representation, we will appoint indifferent appraisers to make an estimate for us, and we will abate from the price of the land at the rate of two dollars per thousand for whatever amount they estimate the pine short of 10,000,000 feet;" and under such parol agreement the defendants had viewed the lands, made their own estimate and returned, and said they were satisfied the plaintiffs' estimate was correct, and had taken a conveyance of the lands and paid the purchase money. There could be no question that in such case the defendants would be concluded unless they were able to show that they had made a mistake in their estimate, which mistake was caused by the fraud of the plaintiffs.

We are all agreed that the facts found by the special verdict are too uncertain, vague and indefinite to authorize a judgment in favor of the defendants upon their counterclaim, and that the judgment of the circuit court must be reversed for that reason; but we are equally divided as to what order should be made in regard to the proceedings which should be

had in the circuit court upon such reversal.   Two of the justices are of the opinion that the cause should be remanded with directions that a new trial be had upon the whole case. The justices who are of this opinion think it probable that the last part of the answer to the twentieth question above quoted was given at the suggestion of the court that no more definite or specific answer was required of them, and that such answer would not be inconsistent with their answer to the third question of the defendants.   And two are of opinion that the order should be that the circuit court enter judgment upon the special verdict in favor of the plaintiffs for the sum demanded by them in their complaint, and dismissing the defendants' counterclaim.

Under these circumstances, the only order this court can make is, that the judgment of the circuit court be reversed, and the cause remanded for further proceedings.   On filing the *remittitur* in the court below, that court will take such proceedings in the action as it may deem just under all the circumstances, and either order a new trial or enter judgment upon the special verdict in favor of the plaintiffs for the amount of their claim, rejecting the defendants' counterclaim. The right of the circuit court to direct a new trial or otherwise, in a case of this kind, is fully recognized by this court in *Noonan v. Orton*, 31 Wis., 265.

*By the Court.*— The judgment of the circuit court is reversed, with costs, and the cause remanded for further proceedings according to law.